**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. <u>20-3050-MJ-OTAZO-REYES</u>

**UNITED STATES OF AMERICA**

v.

**MARK SCOTT GRENON,**
**JONATHAN DAVID GRENON,**
**JORDAN PAUL GRENON, and**
**JOSEPH TIMOTHY GRENON,**

      **Defendants.**
_____/

<u>**GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION**</u>

    The United States of America respectfully submits that Defendant Mark Scott Grenon and his sons, Defendants Jonathan, Jordan, and Joseph Grenon (collectively, the "Defendants"), should be detained pending trial pursuant to the Bail Reform Act, 18 U.S.C. § 3142(e)(1).

    The Defendants are currently exploiting the viral pandemic ravaging the United States by marketing a toxic industrial bleach as a cure for COVID-19. This bleach, which they brand as Miracle Mineral Solution ("MMS"), has already poisoned thousands. Due to the Defendants' unlawful and immensely dangerous conduct, a U.S. District Judge for the Southern District of Florida issued an injunction prohibiting the Defendants from marketing MMS. Yet since then, the Defendants have openly and vehemently defied the Court, threatening "'civil disobedience' against this unjust order! … The 2nd Amendment is there in case it can't be done peaceably." The whole idea of bond is that the defendants can be trusted to comply with court orders requiring their appearance and setting conditions for their release. There is no basis to think these Defendants will comply with <u>any</u> order, let alone bond terms. They are a danger to the community, especially

in this public health crisis; they also present a serious risk of flight and of obstructing justice. They should be detained pending trial.

## BACKGROUND

### A.    Criminal Charges

On June 29, 2020, the Honorable Alicia M. Otazo-Reyes, U.S. Magistrate Judge for the Southern District of Florida, authorized a Criminal Complaint charging the Defendants with conspiracy to defraud the United States and to commit an offense against the United States by introducing a misbranded drug into interstate commerce, in violation of 18 U.S.C. § 371, and criminal contempt, in violation of 18 U.S.C. § 401(3). *See* Case No. 20-mj-3050 (S.D. Fla.), ECF No. 1 (attached hereto as Exhibit 1).

According to the United States' preliminary calculation of the Sentencing Guidelines, if the Defendants are convicted of these offenses, they will likely face terms of imprisonment of 168-210 months.

### B.    The Fraudulent Scheme

The Defendants manufacture, promote, sell, and distribute MMS, a chemical solution containing sodium chlorite and water. When ingested orally as directed by the Defendants, MMS becomes chlorine dioxide, a powerful bleaching agent typically used for industrial water treatment or bleaching textiles, pulp, and paper.

The Defendants claim that MMS is a miracle cure-all that can treat, prevent, and cure a variety of serious diseases and disorders, including cancer, Alzheimer's, autism, Parkinson's, multiple sclerosis, and HIV/AIDS. Recently, the Defendants have promoted MMS as a cure for COVID-19. However, MMS has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of any of these diseases and disorders, or for any other use. Rather, the

FDA has previously issued public warnings strongly urging consumers not to purchase or use MMS, advising that ingesting MMS "is the same as drinking bleach" and "has caused serious and potentially life-threatening side effects," including severe vomiting, diarrhea, and life-threatening low blood pressure.  *See FDA warns consumers about the dangerous and potentially life threatening side effects of Miracle Mineral Solution* (Aug. 12, 2019), https://www.fda.gov/news-events/press-announcements/fda-warns-consumers-about-dangerous-and-potentially-life-threatening-side-effects-miracle-mineral.

FDA has received numerous reports of adverse reactions to MMS, including hospitalizations, life-threatening conditions, and death.  According to the American Association of Poison Control Centers, since 2014, poison control centers have managed more than 16,000 cases involving chlorine dioxide poisoning, including approximately 2,500 cases involving children under 12 years old, many of whom suffered serious side effects, such as a six-year-old autistic girl who was hospitalized with liver failure in 2017.

Over the past several years, the Defendants sold tens of thousands of bottles of MMS nationwide, including to consumers throughout the Middle District of Florida and Southern District of Florida.  The Defendants promoted and distributed MMS through a complex network of websites that they created and maintained.  These websites featured countless newsletters, posts, and articles authored by the Defendants, and dozens of podcasts and video interviews featuring the Defendants, in which they tout the miracle healing powers of MMS.

Although the Defendants have sold MMS for several years, their sales skyrocketed once they began promoting MMS as a cure for COVID-19 in the middle of a global public health emergency.  According to their financial records, from April 2019 through December 2019, the Defendants received an average of approximately $32,000 per month in MMS-related sales

revenue. But in March 2020—the month when they began promoting MMS as a cure for COVID-19—they received approximately $123,000 in monthly MMS-related sales revenue, a nearly 400% increase in sales.

The Defendants' marketing claims with respect to MMS are neither accurate nor subtle. For example, on March 4, 2020, Defendant Mark Grenon published a newsletter extolling the healing powers of MMS as a treatment for COVID-19, which he titled, "The Coronavirus is curable! Do you believe it? You better!" That newsletter provided detailed dosing instructions for using MMS to treat COVID-19, including one set of MMS dosing instructions "for adults," and another set of dosing instructions "for small children." The newsletter claimed that these dosages of MMS "should wipe [ ] out" COVID-19. Several days later, Mark and his son, Defendant Joseph Grenon, released a podcast similarly titled "The Coronavirus is curable! Do you believe it? You better!" in which they claimed that oral ingestion of "MMS will kill [COVID-19]."

The Defendants were well aware that their marketing activities with respect to MMS were unlawful. So, they decided to sell MMS under the guise of the Genesis II Church of Health and Healing ("Genesis"), an avowedly non-religious entity that Mark Grenon created in an attempt to avoid government regulation of MMS. The Defendants have repeatedly admitted that they operated the Genesis "church" for the express purpose of cloaking their unlawful conduct with respect to MMS as constitutionally protected religious exercise, in an attempt to avoid government scrutiny of their actions and shield themselves from liability. However, Genesis' own websites, which were created and are maintained by the Defendants, describe Genesis as a "non-religious church." And Mark Grenon has admitted, in recorded statements, that Genesis "has nothing to do

with religion," and that he founded Genesis to "legalize the use of MMS" and avoid "going [ ] to jail."

Although the roles of each defendant in the conspiracy to defraud the United States often overlapped, with all of the Grenons variously promoting MMS as a miracle cure-all and facilitating the sale of MMS to consumers, their responsibilities can be broadly categorized as follows. Mark Grenon, the father of the other defendants, is primarily responsible for promoting the supposed curative powers of MMS; he promotes MMS through his extensive online writings, podcasts, interviews, and training seminars. Defendant Joseph Grenon is primarily responsible for assisting his father in the promotion of MMS; the two of them co-host a weekly podcast dedicated to extolling the healing powers of MMS. Defendant Jonathan Grenon is primarily responsible for the manufacturing of MMS; he produces and bottles MMS in a shed in the backyard of his home in Bradenton, Florida. Defendant Jordan Grenon is primarily responsible for the distribution of MMS; he is the point of contact for customers who purchase MMS from the Defendants, and he processes and fulfills customer orders.

### C. The Defendants' Contemptuous Violation of Court Orders

Because of the foregoing conduct, on April 16, 2020, the United States filed a civil complaint against the Defendants and Genesis in the U.S. District Court for the Southern District of Florida, seeking an injunction to prohibit the Defendants from further violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"). *See* Case No. 20-cv-21601 (S.D. Fla.), ECF No. 1. U.S. District Judge Kathleen M. Williams issued a Temporary Restraining Order on April 17, 2020 (the "TRO") (attached hereto as Exhibit 2), and an Order of Preliminary Injunction on May 1, 2020 (the "PI") (attached hereto as Exhibit 3), both of which prohibited the Defendants from "directly or indirectly, label[ing], hold[ing], and/or distribut[ing] any

5

[misbranded] drug, including but not limited to MMS . . . ." Ex. 2 at 3; Ex. 3 at 8. Notably, in issuing the PI, Judge Williams found that the "United States has demonstrated a substantial likelihood" that the Defendants' marketing of MMS violated the FDCA. Ex. 3 at 3-5.

Despite knowing about the TRO and the PI,[1] the Defendants willfully violated those court orders by continuing to label and distribute MMS. With respect to labeling, as of the date of this motion, the Defendants have refused to remove from their website the newsletter or podcast titled, "The Coronavirus is curable! Do you believe it? You better!" which promotes MMS as a cure for COVID-19. Furthermore, on June 8, 2020, months after the issuance of the TRO and the PI, Mark Grenon published a newsletter featuring purported testimonials by users of MMS. One testimonial stated that the user "beat stage 4 terminal cancer" by ingesting MMS. That same testimonial stated that the user also successfully treated the flu, asthma, arthritis, fibromyalgia, and diabetes with MMS. Another testimonial featured in that same newsletter boasted that several MMS users had just "traveled to the Philippines and had to pass through Seoul, Korea and Tokyo, Japan airports where just about everyone was wearing the masks for coronavirus," but the MMS users "had no fear (and no masks) because [they] had MMS protection." The testimonial concluded by noting that the users were "back home and everyone is still healthy."

The Defendants also violated the TRO and the PI by continuing to distribute MMS. For example, on June 13, 2020, Jordan Grenon published a newsletter written by his brother, Jonathan, in which Jonathan admitted that, despite the TRO and the PI, the Defendants "*never stopped telling people how they can acquire [MMS]*" (emphasis added). That newsletter also directed consumers

---

[1]  Although the Defendants have failed to appear in the civil case, despite being properly served and notified about the proceeding, there is no question that they are aware of the TRO and the PI, as evidenced by their public statements denouncing those orders and threatening the district judge.

6

to a video featuring Jonathan, in which he explained that, despite the TRO and the PI, the Defendants had decided to continue distributing MMS directly to consumers. Jonathan explained that, to order MMS from the Defendants, a consumer simply needed to email their order directly to Jonathan or Jordan—provided that the consumer disclose in their email if they work for law enforcement, because "FDA" and "DOJ" are "trying to cause us trouble." A few weeks later, on July 4, 2020, Jonathan posted a new video in which he stated that the Defendants had distributed "over a hundred" bottles of MMS to consumers over the prior two to three weeks.

While the Defendants' actions with respect to labeling and distributing MMS plainly violated the TRO and the PI, the Defendants' public statements remove any doubt as to whether those violations were willful. For example, on April 21, 2020, in a letter addressed to U.S. District Judge Kathleen M. Williams and attorneys for the United States, co-signed by all of the Defendants, the Defendants claimed that they were "NOT bound to obey" the TRO. Case No. 20-cv-21601 (S.D. Fla.), ECF No. 11 (attached hereto as Exhibit 4). In another letter addressed to Judge Williams and attorneys for the United States dated that same day, Mark Grenon, on behalf of all the Defendants, wrote: "We are practicing 'civil disobedience' against this unjust order! … Civil disobedience is permitted in the US Constitution[,] peaceably of course at first[,] if possible . . . . NOTE: The 2nd Amendment is there in case it can't be done peaceably . . . . The Genesis II Church of Health and Healing will not stop . . . providing [MMS] to the world! The DOJ and FDA have NO authority over our Church." *See* Case No. 20-cv-21601 (S.D. Fla.), ECF No. 11 (attached hereto as Exhibit 5). Similarly, in several of the weekly Genesis podcasts co-hosted by Mark and Joseph Grenon, they acknowledged: "We're violating a temporary restraining order. Well, we don't care. Okay? Don't care . . . . We're going to do it whether you like it or not." They further threatened to "pick up guns" and instigate "a Waco" should the government interfere with the

Defendants' marketing of MMS, while remarking of Judge Williams, "You think we're afraid of some Obama-appointed judge that broke their oath? … You're no judge . . . . This judge could go to jail . . . . You could be taken out, Ms. Williams . . . . [W]e're not obeying it. Don't care what you do."

## I.     ARGUMENT

The Bail Reform Act empowers the Court to detain a defendant pending trial upon a finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1) A finding that a defendant represents an unacceptable risk of nonappearance must be supported by a preponderance of the evidence, while a finding that a defendant presents a danger to the community must be supported by clear and convincing evidence. *See* 18 U.S.C. § 3142(f); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990). As discussed below, a finding that a defendant will attempt to obstruct justice also supports pretrial detention.

In determining whether detention pending trial is appropriate, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Consideration of these factors indicates that each of the Defendants should be detained pending trial.

### A.     The Nature and Circumstances of the Offenses Charged

The sophisticated nature of the Defendants' conspiracy, their extensive efforts to cloak their unlawful conduct as protected religious exercise, their exposure to lengthy terms of

imprisonment, and their demonstrated refusal to comply with court orders, show they pose a substantial risk of nonappearance and threat to public safety.

As explained in detail in the criminal complaint, the Defendants spent years marketing MMS through a complex network of websites they controlled. These websites featured a vast array of newsletters, articles, podcasts, and video interviews produced by the Defendants, in which the Defendants lauded the miracle healing properties of MMS. Through these wide-ranging online promotional efforts, which targeted vulnerable populations with incurable or otherwise serious diseases and disorders, the Defendants sold thousands of bottles of MMS to consumers all across the country, poisoning countless Americans. Knowing full well that their conduct was illegal, the Defendants decided to market MMS under the guise of a "health church," an elaborate ruse designed to shield themselves from government regulation and liability. And when the government attempted to halt the Defendants' unlawful conduct, and a federal court issued an injunction prohibiting them from further marketing MMS, the Defendants willfully violated that injunction, giving rise to criminal contempt.

The Defendants' ongoing contempt is especially important in considering whether there are conditions of bond that will ensure their appearance. The Defendants have a history of proudly violating court orders, making it highly unlikely that any combination of conditions will reasonably assure their presence at future proceedings as required by the Court. Time and again over the past several months, the Defendants have flouted their refusal to comply with court orders prohibiting them from marketing MMS, while proclaiming that they need not, and will never, obey the law. Even more egregious than the Defendants' repeated violations of the court-ordered injunction, the Defendants have threatened violence against the federal judge who ordered that injunction.

Given the Defendants' sophisticated ability to perpetrate fraud, conceal unlawful conduct, and defy government authorities, and their exposure to long prison sentences, the Defendants pose a serious risk of nonappearance and threat to public safety, especially in the current health crisis.

**B.     The Weight of the Evidence**

The evidence proving the Defendants conspired to violate the FDCA is overwhelming. Indeed, the District Court presiding over the parallel civil case has already found that the "United States has demonstrated a substantial likelihood" that the Defendants violated the FDCA, the same offense that underlies the criminal conspiracy charged here.  Ex. 3 at 3-5.

There is no question that MMS is a "drug" subject to regulation under the FDCA, because the Defendants have claimed on countless occasions—including in newsletters, articles, podcasts, and video interviews written by and/or featuring the Defendants—that MMS is intended for curing, mitigating, treating, and/or preventing a litany of serious diseases and disorders, including COVID-19, cancer, Alzheimer's, autism, Parkinson's, multiple sclerosis, and HIV/AIDS.  *See* 21 U.S.C. § 321(g)(1).

There is no question that MMS is misbranded, because: (1) its labeling does not, and logically cannot, bear directions under which a layman can use MMS safely and for the purposes for which it is intended—e.g., to "cure" diseases that are incurable, such as COVID-19, Alzheimer's, autism, Parkinson's, and multiple sclerosis, *see* 21 U.S.C. § 352(f)(1); and (2) MMS is manufactured in an establishment not duly registered with FDA, to wit, a shed in the backyard of Defendant Jonathan Grenon's house, as can be seen in videos recorded by and featuring Jonathan, *see* 21 U.S.C. § 352(o).

There is no question the Defendants introduced MMS into interstate commerce, as billing invoices and shipping records reveal thousands of interstate shipments of MMS from Jonathan

Grenon's home in Bradenton, Florida, to consumers across the country—including interstate shipments for MMS initiated by undercover law enforcement officers, through documented communications with Jordan Grenon.

And there is no question the Defendants—all immediate family members—conspired together to commit these violations of the FDCA, as all of the Defendants openly acknowledge their participation in the conspiracy. Mark and Joseph Grenon publicly broadcast themselves in Genesis-affiliated podcasts and interviews touting the myriad diseases that MMS can cure; Jonathan proudly posts videos of himself to Genesis-affiliated websites showing the MMS manufacturing facility that he operates in his backyard; and Jordan holds himself out to the public on Genesis-affiliated websites as the point of contact for consumers interested in purchasing MMS. Likewise, the Defendants have admitted in numerous recorded statements that they operated Genesis as a family for the sole purpose of shielding their unlawful manufacture, promotion, sale, and distribution of MMS from government regulation—plain admissions of their fraudulent intent, and their guilt.

That the Defendants also have committed criminal contempt is similarly beyond dispute. As mentioned above, and as detailed in the criminal complaint, the Defendants' actions in continuing to label and distribute MMS plainly violate the TRO and the PI. All of these actions are deliberate and willful; there is no confusion or uncertainty. Considering the Defendants' repeated proclamations that they will not comply with the injunction, and their public boasting that they are violating court orders, the government's proof of criminal contempt is overwhelming.

In sum, the strong weight of the evidence heavily favors pretrial detention.

### C.      The Defendants' History and Characteristics

The Defendants' past travel practices, financial resources, and history of nonappearance make it even more unlikely that any combination of conditions will reasonably assure their presence at future proceedings. Equally or more significant, however, is the Defendants' plain and admitted intent to obstruct justice.

In addressing a pretrial detention request, courts consider whether the defendant presents a risk of obstructing justice, and a court may detain a defendant if it finds that the defendant will obstruct justice once released on bond. *See, e.g.*, 18 U.S.C. 3142(f)(2)(B) (allowing the government to seek detention if the case involves "a serious risk that such person will obstruct or attempt to obstruct justice"); *United States v. Esformes*, Case No. 16-cr-20549 (S.D. Fla.), ECF No. 68 (detaining fraud defendant in part based upon "serious risk that he will attempt to obstruct justice as per 18 U.S.C. § 3142(f)(2)"). The "willingness to obstruct justice evinces a lack of respect for the rule of law and weighs heavily towards a finding that Defendant is a flight risk and a danger to the community." *United States v. Burstyn*, 2005 WL 2297605, at *4 (S.D. Fla. March 18, 2005). Accordingly, "obstruction of justice, an attack on the rule of law, is a traditional ground for pretrial detention." *Id. See also United States v. LaFontaine*, 210 F.3d 125, 134 (2nd Cir. 2000) (similar); *United States v. Hannah*, 2010 WL 2628653, at *3 (S.D. Cal. June 29, 2010) (defendant's "demonstrated disregard for the integrity of the legal system and the orders of the court" are significant consideration in determining whether pretrial release is appropriate).

The Grenons have demonstrated their lack of respect for the law by refusing to comply with court orders precluding the distribution of MMS, as well as by their strident and dangerous public pronouncements defying those orders and the federal judge issuing them. This is not only contempt, but shows a readiness to obstruct justice in every sense. In *Esformes*, the district court

affirmed the magistrate judge's initial detention order in part because the defendant subsequently violated a TRO, just as the Grenons have been doing here with the TRO and PI in the parallel civil case here.  *See* Case No. 16-cr-20549 (S.D. Fla.), ECF No. 133 at 26-27.  As the district court explained in *Esformes*: "A court order releasing a defendant pending trial is predicated on the defendant's credible promise to follow the Court's orders – including all of the conditions of release.  [] The pledging of monies for a bond, however substantial, and the promise of obeying conditions of release, however rigorous, are little assurance when the Court's authority has already been flouted by the Defendant."  *Id.*  The Eleventh Circuit subsequently upheld the detention order.  *See* Case No. 16-16485 (11th Cir. Feb. 28, 2017).  That is exactly the situation we have in this case for the Grenons.

Obstruction aside, the Defendants present a risk of flight.  All of the Defendants have an extensive history of international travel, particularly to Colombia.  Specifically, Mark Grenon owns a residential compound in Santa Marta, Colombia, where, as part of the Defendants' conspiracy to market MMS, the Defendants operate what they call a "Restoration Center."  At this center, the Defendants offer MMS-focused retreats to consumers, for the price of $5,000 per month.  All of the Defendants have traveled extensively to this Colombian compound.  In fact, Jonathan was in Colombia as recently as February 2020, and it is believed that Mark and Joseph may be residing at the Colombian compound as of the date of this filing.  Similarly, Defendants Jonathan and Jordan also frequently travel internationally to the Dominican Republic, including multiple trips by each Defendant in the last two years alone, as Jonathan's domestic partner is from the Dominican Republic and it is believed the Defendants have close family ties in that country.

Furthermore, the Defendants' financial resources indicate they present a high risk of flight.  Although the government does not presently have access to current account statements, the

government does have financial records showing that, in the last year, the Defendants collected *at least* $500,000 in MMS-related sales revenue, including over $120,000 in March 2020 alone. While COVID-19 restrictions make some travel more difficult, airplanes continue to fly, other transportation options exist, and the Defendants' financial resources would easily enable the Defendants to flee to Colombia, the Dominican Republic, or a country that does not extradite to the United States should they decide to flee rather than appear for future proceedings. Additionally, the concern is not merely whether these Defendants will escape overseas, but whether they will show up in court each and every time a federal judge orders them to do so. On this record, especially given their ongoing contempt, there is no basis to find with confidence that they will.

Indeed, not only do the Defendants have a history of violating court orders, they also have a history of failing to appear for court proceedings. In the parallel civil enforcement action, the Defendants were served with the TRO, the government's complaint for injunctive relief, and summonses requiring the Defendants to answer the complaint. But the Defendants never responded, failed to appear in any capacity, and the clerk entered defaults against them. *See* Case No. 20-cv-21601 (S.D. Fla.), ECF No. 46.

      **D.**     **The Nature and Seriousness of Defendants' Danger to the Community**

The Bail Reform Act directs the Court to consider also "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). As the Eleventh Circuit has recognized, "[t]he term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday parlance." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988). While "danger to any person" is intended to address physical danger to a particular individual, danger to

the community "refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *Id.*  Thus, "the concern about safety [is] given a broader construction than merely danger of harm involving physical violence." *Id.*

We are in the midst of an unprecedented national emergency, facing a viral pandemic that has claimed the lives of over 130,000 Americans.  The Defendants capitalized on this crisis, and on the public's fears of COVID-19, by marketing their toxic industrial bleach product as a miracle cure.  Their actions directly endangered public health.  The Defendants will undoubtedly continue to endanger public health by distributing MMS if they are not detained pending trial, as they have demonstrated by their unabated distribution of MMS in violation of the injunction.  Given the certainty that the Defendants will persist in their pattern of dangerous criminal activity, to the imminent detriment of the community, pretrial detention is necessary.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court should detain the Defendants pending trial.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:   */s/ Michael B. Homer*
MICHAEL B. HOMER
Assistant United States Attorney
Court ID No. A5502497
JOHN SHIPLEY
Assistant United States Attorney
Florida Bar No. 0069670
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9289